FILED
2016 Jun-03  AM 08:47
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

|  |  |  |
|---|---|---|
| MICHAEL CHESTNUT, | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 4:15-CV-00020-KOB |
| CAROLYN W. COLVIN | ) | |
| ACTING COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On February 11, 2013 the claimant, Michael Chestnut, applied for disability insurance benefits under Title II of the Social Security Act. (R. 139-145). The claimant alleged disability commencing on January 21, 2013, because of chronic lymphocytic leukemia (CLL); chronic kidney disease; hypertension; and monoclonal gammopathy[1] of undetermined significance. (R. 158, 252). The Commissioner denied the claim on May 22, 2013. (R. 93). The claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a hearing on October 16, 2013. (R. 53, 100).

In a decision dated April 17, 2014, the ALJ found that the claimant was not disabled as defined by the Social Security Act and was, therefore, ineligible for social security benefits. (R. 35-50). On November 3, 2014, the Appeals Council denied the claimant's request for review.

[1] "Monoclonal gammopathy of undetermined significance (MGUS) is a condition in which an abnormal protein — known as monoclonal protein or M protein — is in your blood. The protein is produced in a type of white blood cell (plasma cells) in your bone marrow. MGUS usually causes no problems. But sometimes it can progress over years to other disorders, including some forms of blood cancer."
*Monoclonal Gammopathy of Undetermined Significance: Overview*, Mayo Clinic, (April 27, 2016), http://www.mayoclinic.org/diseases-conditions/mgus/home/ovc-20199535.

Consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1- 7). The claimant has exhausted his administrative remedies, and the court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, the court REVERSES and REMANDS the decision of the Commissioner because the ALJ failed to state with particularity the weight afforded to the claimant's treating physician.

## II. ISSUE PRESENTED

Whether the ALJ erred by failing to state with particularity the weight afforded to the claimant's treating physician.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. The court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if his factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commisioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. The court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational

factors, "are not medical opinions,…but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months…" 42 U.S.C. § 423(d)(1)(A). To make this determination the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?

(4) Is the person unable to perform his or her former occupation?
(5) Is the person unable to perform any work within the economy?

An affirmative answer to any of the above questions leads either to
the next question, or, on steps three and five, to a finding of
disability. A negative answer to any question, other than step three,
leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986)[2]; 20 C.F.R. §§ 404.1520, 416,920.

The ALJ must state with particularity the weight given to different medical opinions and
the reasons for that weight, and the failure to do so is reversible error. *Sharfarz v. Bowen*, 825
F.2d 278, 279 (11th Cir. 1987); *see also MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir.
1986). The ALJ must give substantial weight to the medical opinion of a claimant's treating
physician, but he is not forced to base his conclusion on the determination of disability by a
physician or outside entity. *Symonds v. Astrue*, 448 Fed. Appx. 10, 12 (11th Cir. 2011). The
Commissioner may reject any medical opinion if the evidence supports a contrary finding.
*Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985). Where the ALJ fails to articulate specific
reasons for failing to give the opinion of a treating physician controlling weight the ALJ commits
reversible error. *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005).

## V. FACTS

The claimant was sixty-two years old at the time of the ALJ's final decision. (R. 61). The
claimant has a high school education and past relevant work for Leesburg Yarn as a department
supervisor and a department manager. (R. 63). The claimant alleges disability based on chronic
lymphocytic leukemia (CLL), chronic kidney disease, hypertension, and monoclonal
gammopathy of undetermined significance (R. 189, 252).

---

[2] *McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986) was a supplemental security income case (SSI). The same
sequence applies to disability insurance benefits. Cases arising under Title II are appropriately cited as authority in
Title XVI cases. *See, e.g., Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

From 1990 to 2014, the claimant regularly visited Dr. Byron Nelson at Cherokee Health Clinic. (R. 311-340). The claimant's main symptom was chronic fatigue. (R. 279). The claimant's treating physician, Dr. Nelson, did not record an issue with leukocytosis until April 11, 2010, and did not provide a diagnosis. (R. 316). Dr. Nelson first noted that the Harbin Clinic diagnosed the claimant with CLL on April 11, 2010. (R. 315).

Dr. Gerald McCormick of the Harbin Clinic noted that the Harbin Clinic first diagnosed the claimant with CLL in 2008; however the record does not contain lab results to that affect from 2008. (R. 262, 265).

On August 2, 2010, the claimant visited the Harbin Clinic for an evaluation of his CLL at the request of the Dr. Duryea[3] at Cherokee Health Clinic. Dr. Thomas Simpson, MD, of the Harbin Clinic, noted that the claimant's white blood cell count and lymphocyte count were both high, indicating an early stage of CLL. The claimant scheduled a follow-up appointment for additional testing and to discuss the results of the flow cytometry test. (R. 277).

On August 9, 2010, after further testing, Dr. Simpson noted that the claimant had Stage 0 CLL. Dr. Simpson noted that this diagnosis would not require chemotherapy, but would require monitoring. The claimant had a high white blood cell count of 150,000. (R. 270). The claimant did not return to the Harbin Clinic until February 2013. (R. 264).

On August 8, 2012, the claimant visited Dr. Nelson for ongoing, and increasing, knee pain. The claimant told Dr. Nelson that the combination of the pain and fatigue made him unable to work and that he wanted to see an orthopedist. Dr. Nelson referred the claimant to Dr. Lawrence Lemak, MD, from Lemak Sports Medicine, for osteoarthritis in the right knee. Dr. Nelson began filing Family and Medical Leave Act (FMLA) paperwork for the claimant based on his severe knee pain. (R. 254).

---

[3] The claimant saw Dr. Duryea instead of Dr. Nelson because Dr. Nelson was out of the office at the time. (R. 315).

On August 30, 2012, Dr. Lemak performed surgery on the claimant for a complex tear of the medial meniscus, grade IV degenerative changes in the medial femoral condyle, grade III changes in the tibiofemoral condyle, and grade III changes in the medial facet of the patella. (R. 243-246). As soon as two weeks after surgery, Lemak Sports Medicine noted that he was progressing nicely, but was still weak.

On January 16, 2013, the claimant visited Dr. Nelson for chronic fatigue. The claimant told Dr. Nelson that he was having back pain, fatigue, and pain that radiates into his legs, making his legs feel heavy. Dr. Nelson diagnosed the claimant with monoclonal gammopathy of uncertain severity. He gave the claimant a work excuse and leave form until his next visit. (R. 252).

On February 6, 2013, the claimant visited Dr. Nelson for leg soreness. The claimant told Dr. Nelson that his legs still felt heavy and ached at night. The claimant also told Dr. Nelson that he experienced night sweats around his head and neck. Dr. Nelson noted that the claimant had chronic multifactorial fatigue, lower extremity discomfort, controlled hypertension, monoclonal gammopathy, and stable CLL. Dr. Nelson extended the claimant's work excuse until March 19, 2013. (R. 251).

On February 7, 2013, the claimant visited Dr. McCormick for fatigue, night sweats, and shortness of breath. Dr. McCormick screened the claimant; and the Harbin Clinic administered a chest x-ray; EKG; echocardiogram; and an ultrasound of the liver and spleen. The claimant scheduled a follow-up appointment to go over the results of these tests. (R. 265).

On March 13, 2013, the claimant visited Dr. Nelson mainly for sinus issues. The claimant also reported low energy levels and prolonged leg pain that limit his activities. Dr. Nelson gave

the claimant a work excuse but did not prescribe any specific treatment for the claimant's legs. (R. 303).

On March 14, 2013, the claimant visited Dr. McCormick to review his test results from his previous visit with Dr. McCormick. Dr. McCormick found that the claimant's white blood cell count was around 35,000 with no other abnormalities that would suggest negative progression of CLL. Dr. Nelson noted that he saw no reason to intervene with chemotherapy. The claimant stated his pain was three on a scale from zero to ten. (R. 262).

On April 13, 2013, Dr. Ronald Borlaza, MD, conducted a consultative examination on the claimant at the request of the Disability Determination Service. Dr. Borlaza noted that the claimant had chronic fatigue because of CLL, aggravated by stress. Dr. Borlaza noted that the claimant could wash dishes, do laundry, cook, bathe, dress, and feed himself. Dr. Borlaza also noted that the claimant did not need an assistive device to walk, was able to complete hop testing, and was able to do toe/heel testing with only mild imbalance. Dr. Borlaza further noted that the claimant had 5/5 muscle strength in all extremities bilaterally and could hold objects securely to the palm by the last three digits. Dr. Borlaza concluded that the claimant had no standing limitations, could walk for six to eight hours; had no sitting limitations; could carry up to 100 pounds occasionally and 50 pounds frequently; and had no issues hearing, speaking, and traveling. Dr. Borlaza also concluded the claimant could crouch, kneel, and crawl without limitations, and could climb stairs and ladders frequently. (R. 279-282).

On June 11, 2013, the claimant visited Dr. Nelson for excessive sleepiness and fatigue. Dr. Nelson noted in his analysis that the claimant had "easy fatigability multifactorial in view of his monoclonal gammopathy and CLL", and that the claimant's chronic back and leg pain was

partly neuropathic. Dr. Nelson further extended the claimant's work leave for two months.  (R. 301).

On August, 16, 2013, the claimant visited Dr. Nelson because of new symptoms related to hearing and vision problems. Dr. Nelson noted in his analysis that tests did not substantiate hearing and visual loss. Dr. Nelson further noted that the claimant had borderline blood pressure control issues, stable CLL, stable monoclonal gammopathy and that the "continued constellation of symptoms makes him unable to work." Dr. Nelson gave the claimant a work excuse until the claimant's retirement on October 21, 2013. (R. 312).

On September 5, 2013, the claimant visited Dr. McCormick for a six month follow-up appointment. Dr. McCormick noted that the claimant's white blood cell count was down to 32,000 and that the claimant's CLL was stable and saw no indication to intervene with chemotherapy. (R. 307).

After the ALJ hearing, the claimant visited Dr. Nelson for continued leg pain. Dr. Nelson prescribed the claimant 10 milligrams of hydrocodone, 325 milligrams of acetaminophen, and 7.5 milligrams of meloxicam for back pain radiating into his legs. Dr. Nelson did not make note of any symptoms relation to CLL at this visit. (R. 27).

*The ALJ Hearing*

After the Commissioner denied the claimant's request for disability insured benefits, the claimant requested and received a hearing before an ALJ. (R. 1, 31). At the hearing on October 16, 2013, the claimant testified that he was diagnosed with CLL in 2008. The claimant testified that he worked for Leesburg Yarn for 15 years as a department manager and then 4 years as a supervisor after Leesburg Yarn downsized. The claimant stated that he had to cover sixty acres making rounds, which sometimes involved going up and down stairs. Because of chronic fatigue

and worsening leg pain the claimant just "couldn't hold up." (R. 57-58). The claimant also testified that he had night sweats and trouble feeling rested even after a sufficient amount of sleep. The claimant testified that the combination of symptoms cause him to lie down for 1 to 2 hours a day. (R. 59).

The claimant testified that he tried to take care of his eighty-five year-old dad, eighty-seven year-old mother-in-law, and wife who all have health issues. The claimant testified that he spends his day running errands for his mom, dad, and wife. He also makes his bed, washes dishes, mows the lawn on a riding mower, and can do basic chores around the house. The claimant testified that he needs a break from these daily activities to lie down at least every two hours. (R. 58-59).

The claimant testified that he does not have trouble driving, traveling at least 15 miles daily to see his father. The claimant testified that he can only walk for five minutes before needing a break. The claimant testified that after five minutes his balance feels off, his legs are throbbing, and he feels out of breath. The claimant testified that he can pick up five to ten pounds, and that he can hold a gallon of milk, but not for very long. (R. 60-63). The claimant testified that stress worsens his conditions; and his stress typically comes from work and the health of his family. (R. 58).

A vocational expert, Dr. Crunk, testified concerning the type and availability of jobs that the claimant was able to perform. Dr. Crunk testified that the claimant's past relevant work as a department supervisor and production supervisor is categorized as light and skilled work. Dr. Crunk testified that the skills would not transfer to less than light work, and all of the claimant's skills in the textile industry were at a light level. The ALJ asked Dr. Crunk to assume the claimant has a high school education, approaching retirement age, can perform medium work,

can stoop, crouch, and occasionally climb, and can use his lower extremities for pushing and pulling on occasion. Dr. Crunk testified that the claimant could return to work at both of previous positions. Dr. Crunk also testified that a person with these limitations could work as a packer, which has 248,000 jobs nationally and 1,700 in Alabama; a cleaner, which has 315,000 jobs nationally and 2,800 available in Alabama; a production worker, which has 250,000 jobs nationally and 1,800 in Alabama; an assembler, which has 145,000 jobs nationally and 1,600 in Alabama; or a bakery worker, which has 180,000 jobs nationally and 2,000 jobs in Alabama. Dr. Crunk testified that if the claimant could only walk for five minutes or if he needed to lie down for a few hours a day he could not perform any of these jobs. (R. 69-75).

*The ALJ's Decision*

On April 17, 2014, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. (R. 47). First, the ALJ found that the claimant met the insured status requirements of the Social Security Act through September 30, 2017, and had not engaged in substantial gainful activity since the alleged onset date of January 21, 2013. (R. 41).

Next, the ALJ found that the claimant had the severe impairment of CLL. The ALJ also noted that the claimant's medical records indicated a history of hypertension and osteoarthritis, which led to arthroscopic surgery. The ALJ found no debilitating symptoms associated with these conditions. The ALJ stated that no treating physician had placed any work related restrictions on the claimant.[4] (R. 41-44).

Next, the ALJ found that the claimant did not have any impairment or combination of impairments that met or equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, and 404.15e26). The ALJ stated

---

[4] The ALJ did not discuss the limitations implicit in Dr. Nelson's work excuses and did not state the weight given to Dr. Nelson's opinion.

that the evidence of the record did not contain any diagnostic findings, signs, symptoms, or laboratory results to equal or meet any listed requirement. (R. 44).

Next, the ALJ determined that the claimant had the residual functioning capacity to perform medium work that allows for occasional stooping, crouching, and climbing and occasional use of his lower extremities for pushing and pulling movements. The ALJ found that the claimant's testimony was inconsistent with the medical evidence and Dr. Borlaza's consultative opinion. The ALJ considered findings that show no abnormalities of the claimant's respiratory and cardiovascular systems; lack of pedal edema, clubbing or cyanosis of the extremities; the claimant's relatively normal range of motion; and the claimant's absence of an assistive device for walking. (R. 45-46).

The ALJ relied on Dr. Borlaza's consultative examination that demonstrated no limitations for medium work. The ALJ gave Dr. Borlaza's opinion "strong authority" because of its consistency with past relevant records that show no abnormalities in a chest x-ray; EKG; echocardiogram; and an ultrasound of the liver and spleen. The ALJ further stated that the opinion of a non-examining state agency physician, not otherwise mentioned in the decision, was consistent with other evidence and was given minimal authority. (R. 46).

Relying on the testimony of vocational expert Dr. Crunk, the ALJ found that the claimant could perform his past relevant work as a department supervisor and department manager. Thus, the ALJ determined the claimant had not been under a disability, as defined in the Social Security Act, from January 21, 2013, through the date of the decision, April 17, 2014. (R. 46-47)

## VI. DISCUSSION

*The ALJ's Failure to State the Weight Given to the Treating Physician*

The ALJ erred when he failed to articulate the weight given to the claimant's treating physician. The ALJ must state the weight given to each medical opinion and give substantial weight to the medical opinion of a treating physician, but does not have to accept his conclusions. *Sharfarz*, 825 F.2d at 279. *Symonds*, 448 F. App'x at 12. The ALJ may reject any medical opinion if the evidence supports a contrary finding. *Sryock*, 764 F.2d at 835. When substantial evidence supports the ALJ giving less weight to a treating physician's opinion, the ALJ does not commit an error. *Moore*, F.3d at 1212.

Dr. Nelson was the claimant's primary care physician from 1990 to the time of the ALJ's decision. (R. 20-29, 301-304, 311-340). As the claimant's treating physician, Dr. Nelson's opinion is entitled to substantial weight unless the ALJ states with particularity the substantial evidence for not giving him such. Even when the ALJ states reasons to discredit Dr. Nelson's opinion, he still *must* state the specific weight given to his opinion.

*Nowhere* in the ALJ's opinion does he make *any* mention of what weight he gives Dr. Nelson's opinion. The ALJ gave Dr. Borlaza's opinion substantial weight, and a non-examining state agency physician's opinion minimal weight, but never mentioned the weight given to Dr. Nelson's opinion. (R. 46).

The ALJ implicitly found that Dr. Nelson did not give an "opinion" and, therefore, he did not give Dr. Nelson's work excuses any weight. By stating that no doctor placed any work limitations on the claimant, the ALJ implied that Dr. Nelson did not give an opinion about the claimant's functional capacity. However, the court finds that a medical opinion is implicit in Dr. Nelson's work excuses.

In the August 16, 2013 medical record, Dr. Nelson noted in his analysis that the claimant suffered from a "continued constellation of symptoms making him unable to work." (R. 312). Dr. Nelson also noted as prescriptive treatment that the claimant was given a "work excuse until [his retirement]." Id. This work excuse was the sixth such excuse that Dr. Nelson gave the claimant. (R. 251, 252, 301, 303, 304, 312). These work excuses contain a reasonable inference that Dr. Nelson, in his medical opinion based on his ongoing treatment of the claimant, believed that the claimant's symptoms imposed limitations on his ability to perform the functions of his job. Although Dr. Nelson did not list each and every limitation, the work excuses reflected his opinion regarding the claimant's limitations. As such, the ALJ *must* state the weight given to Dr. Nelson's opinion and his reasons for discrediting that opinion.

The Commissioner argues that Dr. Nelson's work excuses are not a medical opinions, but legal opinions that are left only to the Commissioner. (Doc. 9 at 13-14) citing *Lewis v. Callahan*, 125 F.3d 1436 (11th Cir. 1997). However, the Court in *Lewis* refers to the doctor's statement that "[i]n view of his documented cardiac problems I certainly would feel that he should qualify for disability and be declared completely disabled." *Lewis*, 125 F.3d at 1438. The Commissioner is right, that the Eleventh Circuit did not want the doctor's opinion of the legal consequences to be given controlling weight. *Lewis*, 125 F.3d 1436. However, the *Lewis* opinion does not state that a doctor's opinion about the claimant's ability to work should be given no weight, only that the doctor cannot make a determination of disability. In this case, Dr. Nelson never says that the claimant should qualify for disability—he only gave work excuses as treatment.

The court concludes that Dr. Nelson's work excuse implied a medical opinion about the claimant's functional ability and the ALJ must give Dr. Nelson particular weight. By failing to state the weight given to Dr. Nelson's opinion, the ALJ made a reversible error.

The court also notes that the claimant raised the issue of whether the ALJ failed to properly evaluate the credibility of the claimant's pain testimony. The court cannot assess the pain standard issue without the ALJ's assessment of the weight given to Dr. Nelson.

## VII. CONCLUSION

For the reasons stated above, the court concludes that the Commissioner did not state with particularity the weight given to Dr. Nelson's opinion about the claimant's work limitations. Accordingly, the court REVERSES and REMANDS the decision of the Commissioner. The court will enter a separate Order to that effect simultaneously.

DONE and ORDERED this 3rd day of June, 2016.


**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE